**-FILED-**

**JAN 11 2018**

At _____ M
ROBERT N. TRGOVICH, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

[*This form is for non-prisoners to file a civil complaint. NEATLY print in ink (or type) your answers.*]

JANET WEHMEYER
_____
[*You are the* **PLAINTIFF**, *print your full name on this line.*]

v.

DEREK BOLKA
_____
[*The* **DEFENDANT** *is who you are suing. Put ONE name on this line. List ALL defendants below, including this one.*]

Case Number  $2:18CV 15$

[*For a new case in this court, leave blank. The court will assign a case number.*]

[*The top of this page is the caption. Everything you file in this case must have the same caption. Once you know your case number, it is VERY IMPORTANT that you include it on everything you send to the court for this case. DO NOT send more than one copy of anything to the court.*]

## CIVIL COMPLAINT

| # | Defendant's Name and Job Title | Address |
|---|---|---|
| 1 | [*Put the defendant named in the caption in this box.*] <br><br> SEE ATTACHMENT NO. 1 | |
| 2 | [*Put the names of any other defendants in these boxes.*] | |
| 3 | | |

[*If you are suing more defendants, attach an additional page. Number each defendant. Put the name, job title, and address of each defendant in a separate box as shown here.*]

1. How many defendants are you suing? ___12___

2. What is your address? 708 Camelot Manor Portage, IN 46368
_____

3. What is your telephone number: ( 219 ) 448-9898

4. Have you ever sued anyone for these exact same claims?

   ⊘ No.

   ◯ Yes, attached is a copy of the final judgment OR an additional sheet listing the court, case number, file date, judgment date, and result of the previous case(s).

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]

## CLAIMS and FACTS

DO: Write a short and plain statement telling what each defendant did wrong.

DO: Use simple English words and sentences.

   **DO NOT**: Quote from cases or statutes, use legal terms, or make legal arguments.

DO: Explain when, where, why, and how these events happened.

DO: Include every fact necessary to explain your case and describe your injuries or damages.

DO: Number any documents you attach and refer to them by number in your complaint.

   **DO NOT**: Include the names of minors, social security numbers, or dates of birth.

DO: Use each defendant's name every time you refer to that defendant.

DO: Number your paragraphs. [*The first paragraph has been numbered for you.*]

1. SEE ATTACHMENT NO. 2 _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]

Claims and Facts (continued)

_____

_____

_____

_____

_____

_____

_____

## PRIOR LAWSUITS – Have you ever sued anyone for this exact same event?

- ☑ No.
- ◯ Yes, attached is a copy of the final judgment OR an additional sheet listing the court, case number, file date, judgment date, and result of the previous case(s).

## RELIEF – If you win this case, what do you want the court to order the defendant to do?

SEE ATTACHMENT NO. 2

_____

_____

_____

_____

_____

## FILING FEE – Are you paying the filing fee?

- ◯ Yes, I am paying the $400.00 filing fee. I understand that I am responsible to notify the defendant about this case as required by Federal Rule of Civil Procedure 4. [*If you want the clerk to sign and seal a summons, you need to prepare the summons and submit it to the clerk.*]
- ☑ No, I am filing a Motion to Proceed In Forma Pauperis and asking the court to notify the defendant about this case.

[*Initial Each Statement*]

*JW*   I will keep a copy of this complaint for my records.

*JW*   I will promptly notify the court of any change of address.

*JW*   I declare **under penalty of perjury** that the statements in this complaint are true.

Signature _____     Date   1-11-18 _____

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]

## <u>Attachment No. 1 – List of Defendants</u>

Derek Bolka, Family Case Manager (FCM)
2109 Welnetz Road
Michigan city, IN 46360-6504

Nancy Seeley, Court Appointed Special Advocate
Family and Youth Services Bureau
253 West Lincolnway
Valparaiso, IN 46385

Diane Wyszynski
Family Focus, Inc.
660 W Morthland Dr. Suite A
Valparaiso, IN 46385

Tina Dingman (Family Case Management Supervisor "FCMS"?)
Porter County DCS
19 E. Lincolnway
Valparaiso, IN 46383

Steve Stofeik ((Family Case Management Supervisor "FCMS"?)
Porter County DCS
19 E. Lincolnway
Valparaiso, IN 46383

Debbie Zarowny, foster parent
211 W 875 N
Valparaiso, IN 46385

Nicole Slack, Home School Advisor
Portage Central Elementary School
2825 Russell St.
Portage, IN 46368

Mary Beth Bonaventura, former Director of Indiana Department of Child
Services

Terry J. Stigdon, in her capacity as the new director of the Indiana Department of
Child Services
DCS Central Office
302 W. Washington St.
Indianapolis, IN 46204-2738

Terrance Ciboch, Regional Director
Indiana Department of Child Services
1621 S. Woodland Ave.
Michigan City, IN 46360

Louella F. Richey-Brown, Director of Porter County DCS Office
19 E. Lincolnway
Valparaiso, IN 46383-5514

Ronald May
247 North 9th Street
Steubenville, OH 43952


John Does 1 through 12

## ATTACHMENT NO. 2

## CLAIMS AND FACTS

1.     In this action brought under 42 U.S.C. § 1983, Janet Wehmeyer,

individually and on behalf of her minor children, E.W. and C.W., seek redress for

the violation of their civil rights under state law, federal law and the First, Fourth,

and Fourteenth Amendments to the United States Constitution.

2.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.

3.     Venue is proper in the Northern District of Indiana under 28 U.S.C. §

1391(b) since all defendants reside in Indiana and at least 10 of the 12 (defendants

Bolka, Richey-Brown, Nancy Seeley, Wyszynski, Dingman, Stofeik, Zarowny, Slack,

and Ciboch) live and/or work in the Northern District of Indiana. In addition, a

substantial part of the events giving rise to the claims occurred in the Northern

District of Indiana.

## PLAINTIFFS

4.     Janet Wehmeyer ("Janet"), E.W. and C.W. are all citizens of the United

States. At all times relevant to this Complaint, the Plaintiffs resided in Porter

County at Portage, Indiana.

5.     Janet is the natural mother of E.W. and C.W., and was awarded full

physical and legal custody of the children as a result of a court order dated July 25,

2017.

1

## DEFENDANTS

6.     Louella F. Richey-Brown is the Director of Porter County Department of Child Services (DCS) during the period in question.

7.     Derek Bolka was a Family Case Manager (FCM) for the Porter County DCS during the period in question. On information and belief, Bolka has since resigned from his position.

8.     Tina Dingman is a Family Case Management Supervisor (FCMS) for the Porter County DCS.

9.     Steve Stofeik is also a FCMS for the Porter County DCS.

10.    Terrance Ciboch is the Regional Director for Region 2 (covering Porter, LaPorte, Newton, Jasper, Starke, and Pulaski Counties) of the Indiana Department of Child Services.

11.    Mary Beth Bonaventura was the Director of the Indiana Department of Child Services during the period in question. Ms. Bonaventura resigned from her position effective December 27, 2017.

12.    Terry J. Stigdon is now the Director of the Indiana Department of Child Services, succeeding Ms. Bonaventura in office.

13.    Nicole Slack is the Home/School Advisor at Central Elementary School in Portage County, where E.W. and C.W. attended school for the period in question.

14.    Nancy Seeley is a Court Appointed Special Advocate (CASA) with the Youth Service Bureau of Porter County, Inc., d/b/a Family and Youth Services Bureau.

2

15.    Danuta "Diana" J. Wyszynski Diane Wyszynski is a psychological and behavioral therapist at Family Focus, Inc.

16.    Deborah Zarowny is the foster parent located in Valparaiso, Indiana, with whom E.W. and C.W. were placed when they were removed from Janet's home.

17.    John Does 1–12 are sued under fictitious names since their true names and capacities are unknown to the plaintiffs, who will amend this complaint to identify them when this information becomes available through discovery. Plaintiffs believe that John Does 1–12 are also responsible for the violations of civil rights alleged in this complaint.

18.    The defendants acted individually and jointly under color of state law to deprive the plaintiffs of their civil rights. Because they acted knowingly, recklessly and in disregard of well-established law, with no objectively reasonable basis for their actions, they do not have qualified immunity from damages under the standards set forth by the United States Supreme Court, the Seventh Circuit and this Court.

19.    To the extent a defendant is not a state actor, he or she conspired with the state actors to violate the plaintiffs' civil rights.

## FACTS

### A.    Initial Encounter with Lake County DCS

20.    On or about August 9, 2015, the Plaintiffs had an initial encounter with the Lake County DCS.

21.    At the time, E.W. was 7 years old and C.W. was 6 years old.

3

22.     Janet, together with E.W. and C.W., had spent the night at the home of Janet' sister, Nancy, in Lake Station, Indiana (Lake County).

23.     Nancy was scheduled to watch E.W. and C.W. on the afternoon of August 9, when was scheduled to work.

24.     Around 12:30 p.m., Nancy had not yet returned home from an errand, but had notified Janet that she was running late and would be home in 30-45 minutes.

25.     However, Nancy's son, O.S, who was 12 years old, was at home asleep.

26.     Janet woke O.S. and told him that his mother was running late and that Janet was leaving E.W. and C.W. with him until his mother returned soon.

27.     Janet then left for work.

28.     Unbeknownst to Janet, O.S. fell back asleep, and E.W. and C.W. went to a park two blocks away, where someone spotted them without an adult and called the police.

29.     By the time the police arrived, E.W. and C.W. had returned to Nancy's house on their own.

30.     Janet was called and returned early from work to find the police and the Lake County DCS there with her children, her sister Nancy, and Nancy's husband Miguel Organista, and another sister, Karen.

31.     The Lake County DCS staff informed her that they were taking her children into protective custody but could place them with Janet's sister Karen after they performed a background check on Karen.

4

32. Meanwhile, the Lake County DCS took the children to the DCS office in Gary, Indiana, then placed them in temporary foster care.

B. **Lake County Proceedings**

33. The Lake County DCS thereafter filed a petition in the Lake County Superior Court alleging E.W. and C.W. to be children in need of services (a CHINS petition).

34. On August 11, 2015, the Lake County Superior Court held an initial preliminary hearing on the CHINS petition.

35. Janet was represented by Lisa Berdine, as court-appointed counsel.

36. After hearing evidence, the Court ordered the following:

> a. DCS to conduct a home visit within 48 hours, and if there were no concerns, the children were to be returned to Janet's custody;
>
> b. A clinical assessment to be performed;
>
> c. Authorization for other services to be provided to Janet and her children, at her option.

37. With respect to services, the Court state: "The Court is authorizing those services today; we are not ordering those. So if Ms. Wehmeyer chooses to participate in services, she'll have an opportunity to do so, but she's under no compulsion to do so by order of this Court."

38. The Court specifically denied DCS's request to require Janet to submit to drug and substance-abuse testing because DCS testified that that no evidence or even suspicion of drug use by Janet had been found.

5

39.    The Court then set the matter for a fact-finding hearing to be held on September 28, 2015.

40.    After the August 11, 2015 initial hearing, Janet tried several times a week to contact Ms. Berdine, who would not return her calls.

41.    On August 12, 2015, Lake County DCS staff conducted the home visit at Janet's home in Portage. They found no concerns and returned the children to Janet's care and custody the same day.

42.    On or about August 14, 2015, Brianna Wolfe from North Star Services contacted Janet for a parental assessment. Janet informed her that, based the Court's statement during the hearing quoted above, she believed Ms. Wolfe's services to optional and was declining to participate. When Ms. Wolfe informed Janet that her services had been court-ordered, Janet said she had been trying to get a hold of her counsel, Ms. Berdine, and wanted to confirm with her.

43.    Although Janet could not get in touch with Berdine, she participated anyway.

44.    Despite Janet's repeated attempts over the next several weeks, Janet never heard back from Berdine until Janet was outside the courtroom on September 28, 2015, waiting to be called for the scheduled fact-finding hearing.

45.    At some point after the initial hearing, DCS filed an amended CHINS petition, which Janet did not receive and saw for the first time during the September 28 hearing.

6

46.    During the September 28, 2015 hearing, Berdine and DCS represented to the Court that an agreed resolution had been reached.

47.    Berdine tendered an admission on behalf of Janet that the children were in need of services on the basis that she needed help with the children's education, more specifically, help to ensure that the children's Individual Educational Plans (IEPs) were being followed, together with a request for an educational advocate and home-based case management services.

48.    Berdine also stated on the record that Janet would have the opportunity to explore individual therapy privately.

49.    Janet believed she was simply accepting tutoring for the kids and home-based case management, but did not understand that she was admitting to any allegations contained in the amended CHINS petition.

50.    On the basis of Berdine's representations, the Court adjudicated the amended CHINS petition and ordered the matter transferred to Porter County, where Janet resided.

51.    In response to Janet's question about the transfer, the Court explained that the transfer was for the purpose of providing services, "[b]ut the children are at home with you. That's where they are going to remain, and it would just be a carryover of services, if we're able to maintain that."

C.    **Transfer to Porter County and Follow-Up by Porter County DCS**

52.    On or about October 20, 2015, Janet received a text message from Defendant Bolka explaining that he was the new assigned case worker in Porter County and that they needed to meet that day.

7

53.    Janet informed Bolka that she was not available that day due to her work schedule but could meet with him the next day.

54.    In the afternoon of October 20, 2015, after the children got home from school, Bolka showed up unannounced at Janet's home, just as Janet was getting ready to leave to take her kids to a sitter so she could go to work.

55.    Bolka demanded and intimidated his way into Janet's home, despite the fact that she was trying to leave for work. He stated that if she did not let him in right then, then she must be hiding something.

56.    Bolka then entered the home, and Janet felt she could not stop him based on the duress that he was imposing on her.

57.    During his visit, Bolka stated that he had gone to the children's school to talk with E.W. and C.W. without Janet's knowledge and alleged that the children had told him that Janet "does drugs," that there was not enough food in the house, and that she sleeps all the time.

58.    Bolka also told Janet that he spoken to Ronald May, Janet's ex-boyfriend and the children's natural father. Bolka said that May had alleged that Janet was a drug addict.

59.    When Janet denied any use of illegal drugs, Bolka told her not to worry about it "that smoking weed is not a deal breaker."

60.    To alleviate any concerns that Bolka had about drug use, Janet offered to take a drug test on the spot. The results were negative.

8

61. While inside the home, Bolka took E.W. alone into a separate room for questioning and then later summoned Janet in as well. Bolka wanted to know what was in a particular box, so Janet got it down and put it on the bed so he could see that there were medications in it. He then instructed E.W. to hold one of the medicine containers while he took a photograph, but Bolka intentionally left Janet out of the photo while she was standing beside E.W.. Bolka intentionally and deliberately orchestrated this photograph to create a false impression that E.W. had unsupervised access to the prescribed medications.

62. Derek then led them to the front room of the home, where he grabbed a page of E.W.'s homework, dumped several pills onto her homework, and took another photograph, again intentionally creating a false impression that E.W. had unsupervised access to the prescribed medications.

63. Bolak asked Janet to sign a release for the previous 2 years of her medical records so he could confirm that the medications had been validly prescribed to her. Janet complied with the request.

1. October 26, 2015 Porter County Dispositional Hearing

64. On October 26, 2015, the Porter County Juvenile Court held a dispositional hearing on the transferred matter.

65. In his pre-hearing report submitted to the Court, Bolka stated that the family's home had an adequate food supply, that Janet had submitted to a drug screen that was negative for all substances, and that Janet was had been cooperative during the unannounced visit on October 20.

9

66.    Nevertheless, Bolka made several statements at the hearing under oath that he knew to be false and without any basis. He falsely stated that:

    a. A drug abuse problem existed in the home;

    b. In describing the above photographs, that E.W. had gone into the closet to get the medication, creating the false impression that E.W. had unsupervised access to the medications;

    c. The school's counselor (Nicole Slack) reported that

        i. the children frequently miss school or are tardy;

        ii. the children are frequently dirty and disheveled;

        iii. the school counselor had "major concerns" about the children's behavior;

        iv. Janet cancels meetings abruptly;

    d. The children had poor dental health;

    e. The home was infested with fleas;

67.    Bolka knew that these statements were false and had no basis to make them.

68.    First, he knew there was no drug problem in the home because Janet had already provided a negative drug test.

69.    Moreover, Bolka had been provided Janet's medical history records, which demonstrated the valid prescriptions for her medications. He also staged photographs at the home to intentionally and deliberately create the false impression that the children had unsupervised access to medications.

10

70.    Second, the school counselor and principal have denied any of the statements that Bolka represented were made. Specifically, during a meeting on October 27, 2015, the school counselor denied telling Bolka that Janet's children were dirty or disheveled or that they missed school.

71.    Third, Bolka knew that the children had not shown up to school dirty or unkempt because Ms. Alaniz and Ms. Slack denied that the children go to school dirty.

72.    Fourth, Bolka knew that the children did not frequently miss school, as the children's school records showed that E.W. had missed only 1 day of school and C.W. missed only 2 days, all of which were for illness.

73.    Bolka was aware of these facts before the hearing because the school's Home/School Advisor Nicole Slack had given him a copy of their attendance report prior to the October 26 hearing.

74.    Fifth, Derek falsely and without any basis stated that the children's teeth were in poor health. In fact, on November 5, 2015, just a few days after the hearing, Janet took the children to an appointment with their dentist, who found that C.W.'s teeth were in good health, as were E.W.'s, except for a single cavity in one of her baby teeth. Bolka did not have any experience or training in dentistry and had no basis for his false and unsupported allegation.

2.    **Complaint Concerning Bolka After October Hearing**

75.    After the October 26 hearing, Janet began implementing the plan. On November 30, 2015, the children were evaluated and diagnosed with ADHD by Dr. Nordstrom.

11

76.    The children started seeing Sara Veldhuizen, a clinical psychologist,
where they were working on a behavioral plan for the kids to find out if it would
help with the behavioral problems and that medication would be their last resort to
address any behavioral issues.

77.    Between the October 26 hearing and the January 12 review hearing,
Bolka demonstrated inappropriate conduct and attitudes towards Janet.

78.    As just one example, on November 12, 2015, Bolka signed consent
forms on behalf of the children allowing them to receive service from DCS's
therapist Diane Wyszynski.

79.    Janet reported this and Bolka's other improper and wrongful conduct
and attitudes to DCS and the state ombudsman.

3.    January 12, 2016 Review Hearing

80.    On January 12, 2016, the Court held a periodic review hearing.

81.    At the hearing, Bolka again made the following false statements under
oath that he knew were false or had no basis to believe in their truth.

82.    Bolka falsely stated that Janet had cancelled visits, that she has not
made herself available, and that DCS had asked her to call once a week to set up
visit, but that she would not return calls or respond.

83.    Bolka knew those statements were false because he was provided
monthly reports from the Village (parenting educators) which stated that Janet was
cooperating and has not missed any meetings.

84.    Bolka falsely stated that Janet was not allowing the children to see the
DCS therapist, who was the only therapist acceptable to him, despite the fact that

12

the Lake County court authorized Janet to seek counseling and therapy for herself and the children from a private therapist.

85.    Moreover, during a meeting on December 9, 2015, Bolka told Janet that as long as he could get copies of the children's records the kids could see their own therapist.

86.    Bolka falsely stated that the parenting educators were concerned about the children being in the home and that if Janet would not cooperate with them to learn how to control them that the children are in serious danger.

87.    However, the parenting educators were surprised that the kids were taken from the home, and left them speechless and told Janet that they could not wrap their heads around it.

88.    Bolka falsely stated to that Janet had not been compliant with Sara to get them diagnosed with ADHD at all.

89.    Bolka knew, however, that the children both were already diagnosed on November 30, 2015, by Dr. Nordstrom.

90.    Bolka stated that Sara had additional concerns and would send him detailed records. This statement was and there were no such records.

91.    Bolka also falsely stated that the Village staff (parenting educators) were very concerned about the kids in the home that if Janet doesn't cooperate with them and learn how to monitor these children that they're in serious danger.

92.    Bolka falsely stated that Sara Veldhuizen who is a Clinical Psychologist had many concerns for the children. However, Veldhuizen never

13

submitted reports of her concerns and has never mentioned any concerns for Janet besides trying to work on a behavioral plan with the family.

93.     Bolka stated that Danuta "Diane" Wyszynski is the therapist that DCS recommended and that Wyszynski was very worried about the children and also recommended that Janet participate in sessions with the children.

94.     During the middle of the hearing, before Janet's lawyer had an opportunity to cross-examine any witnesses, the Court stated that it would "take a five minute recess and then I'll make a ruling." Immediately upon the recess, Bolka, the lawyer for DCS, and Court-Appointed Special Advocate Nancy Seeley all left the courtroom and headed toward the judge's chambers.

95.     On January 12, 2016, based on Bolka's recommendation, E.W. and C.W. were removed from Janet's home and placed in foster care with Debbie Zarowny, a non-relative and stranger to the children.

96.     On information and belief, Bolka's actions were taken in retaliation towards Janet for reporting Bolka's improper conduct.

D.     **Mistreatment by Foster Parent Debbie**

97.     When C.W. was first removed from his home he had diarrhea in the bathroom and ended up making a mess. Zarowny made C.W. clean the mess up.

98.     While in foster care the children were being sedated by Zarowny with over-the-counter seasonal allergy medication. Zarowny would tell the children that they were allergic to grass. However, neither C.W. nor E.W. had any allergies. According to Dr. Strayhorn, a psychiatrist who was seeing the children, the kids needed to be sedated due to the trauma of being removed from their home.

14

99.    While in Zarowny's care, the children constantly had bruises all over their bodies. Zarowny accidently burned C.W. on his hip with her cigarette despite the fact that she was prohibited from smoking around the children.

100.    Zarowny and Wyszynski and Bolka would talk negatively about the children's family around them. They would tell the children that they were never going home again to be with their mother. Wyszynski would tell E.W. that her mother was a liar and that is why they weren't going home.

101.    The family put together a picture album for the children and Zarowny took away their pictures.

102.    Zarowny would tell the children that if they got into any trouble that they would not get to go to the family visit.

103.    Zarowny left a bruise on C.W.'s neck allegedly because he would not get off her chair.

104.    Zarowny left a bruise on C.W.'s arm from grabbing his arm and smashing it against the bedroom door because he had asked her to leave the room.

105.    Zarowny would throw C.W. into a dark bedroom with no lights knowing that he was terrified of the dark and hold the door knob so that he could not get out.

106.    Zarowny would not make sure that E.W. brushed her teeth or hair for days at a time.

15

107.    When Janet reported these incidents to the child abuse hotline and the sheriff's department, the sheriff's department went to do a well-being check and Debbie told C.W. that law enforcement had come to take him to jail.

108.    On January 14, 2016 Janet started seeing Wyszynski.

109.    During a therapy session Janet asked Wyszynski why she would tell the children not to tell Janet about what goes on at Zarowny's house. Wyszynski stated that "what happens at Debbie's stay there" and that it was none of Janet's business. After Janet insisted that anything and everything that has to do with the children were her business, Wyszynski told Janet not to "harp on it" and incorrectly asserted that what Zarowny was doing what not abuse.

E.    **Ongoing Interference with Reunification**

110.    On April 7, 2016 Bolka called Janet to tell her that the children's father, Ronald May, had been in Indiana since April 3, 2016, visiting with the children. Janet informed him again that there was a court order stating that May was not to have parenting time or contact with the children and went down to the Lake County court house to get a certified copy of it and texted Bolka a picture of the court order. Bolka knowingly violated the court order and allowed May to visit with the kids up to 3 times a week.

111.    On April 11, 2016 there was a case meeting with Bolka, CASA Nancy Seeley, Diane Wyszynski, Debbie Zarowny, Jessica Pearsall, Jamie Pociask with the Villages, Tavis Grant, Shonette Watson, Janet Miicke the grandmother, and Janet.

16

112.    Janet was told on April 7, 2016 that if she brought her lawyer with her then she would not be allowed into the meeting and that because the father was in town that they would have the meeting without her.

113.    May was there at the meeting. He told Janet that he didn't plan on coming to the court dates because he assumed that DCS was just going to return the kids back with Janet.

114.    In this meeting, Bolka and Wyszynski accused Janet's nephew of sexually abusing E.W.. Bolka and Wyszynski also stated in the meeting that while over at their grandparent's house after the grandparents fell asleep that they watched an inappropriate show on television.

115.    They accused Janet of "farming out" her kids to anyone that would watch them. They accused the grandmother of giving the children cold showers. The foster parent Zarowny admitted to making the children kneel with their hands behind their backs for up to 20 minutes at a time.

116.    Bolka asserted that C.W. needed glasses and accused Janet of keeping him from getting glasses when he needed them. However, C.W.'s last eye exam before the children were removed from their home was on November 5, 2015, and he didn't need glasses at that time.

117.    In the meeting Janet made a statement about the kids being made to kneel with their hands behind their back and Bolka snapped on her when she was expressing her belief that Zarowny was being abusive.

17

118.    During the meeting, Derek, and Diane kept trying to get Janet to say that E.W. could have been sexually abused.

119.    During the meeting, Janet requested that DCS conduct an investigation into the alleged sexual abuse so that they could know what happened.

120.    After being placed into foster care, both E.W. and C.W. experienced a sudden onset of frequent bed-wetting.

121.    When Janet would see the children during visits C.W. had holes in his shoes. Zarowny had the children wearing clothes that were way too big for them. One day at lunch one of the children's pants fell down because they couldn't hold it up to keep them from falling down.

122.    During Janet's visits, C.W. would tell Janet how badly that Zarowny was hurting him. Zarowny would make E.W. stay in the room for over 3 hours at a time. The children reported that Zarowny frequently screamed at them.

123.    Zarowny would make constant threats to C.W., driving him to a police station and telling him that he was going to go to jail.

F.    April 25, 2016 Periodic Review Hearing

124.    On April 25, 2016, the Court held another periodic review hearing.

125.    The court stated that Wyszynski, without providing notice to other parties, specifically sent the court memos concerning sexual abuse and that Janet adamantly denies.

126.    However, on April 12, 2016, Wyszynski told Janet that she believed the kids were not sexually abused but rather had seen something inappropriate on television.

18

127.    During the hearing, it was noted that Janet had moved into a larger home. Bolka falsely stated that he did not know how Janet got the money to move, creating a false impression that Janet had obtained illegal profit. He knew, however, that Janet had used a tax return to accomplish her move and that she had been looking for a bigger trailer for a while.

128.    Although the court had ordered Janet to cooperate with the children's school to address the children's behavioral issues, Bolka told the school not to have meetings with Janet and not to email Janet E.W.'s daily behavior log. On Bolka's instructions, the school held meetings concerning the children without Janet. Zarowny and Wyszynski tell the school not to meet with Janet.

129.    At some point, Diane falsely accused the children's grandfather and a cousin of sexually abusing E.W. and/or C.W..

130.    In May 2016, Misti Perez from Lake County opened an investigation into the sexual abuse allegations.

131.    During Perez's investigation, Zarowny gave Perez false statements about things that happened in school. Perez followed up with the school only to learn that the accusations were false.

132.    Perez's investigation resulted in a conclusion that the children were being coached by Wyszynski during the children's therapy sessions.

133.    While in foster care, the children were taken to see Dr. Joel Schwartz, a clinical psychologist, who diagnosed the children as "feral," a term that refers to a

19

human child who has lived away from human care, loving, or social behavior and
crucially, human language.

134.    The children, however, had been in school and daycare for a few years.
They had not exhibited any problems until they were removed from their home.
They had already been seen by doctors have been in school for years and were doing
great.

G.    <u>August 2, 2016 Permanency Review Hearing</u>

135.    At the August 2, 2016 permanent review hearing, Wyszynski stated
that the children were having a lot of behavioral issues in the foster home.
Wyszynski stated that the behavior had escalated since visitation started back up
after not having any for a month. Wyszynski recommended that the family visits
cease.

136.    A new case worker, E.W. Katona, stated that she went to see the
children in the foster home twice and both times witnessed concerning behaviors.
The same case worker came to a family visit on August 1, 2016, where she
witnessed no odd behavior and stated that it was common child behavior.

137.    E.W. Katona stated that Janet was in denial about the issues or why
DCS needed to be involved. DCS stated that the children could not come home
because DCS wanted Janet to gain a better understanding of the children's
behaviors and needs. However, the children only exhibited that type of behavior
when they were in the foster home.

138.    Despite the fact that Nancy Seeley (CASA) had never been to any
family visits, she stated that she was concerned how Veronica Martin (family

20

therapist) from Family Focus was handling the supervised therapeutic visitation because she feels that Veronica does not seem to follow the directions of supervised visits and was not doing her job.

139.    On January 20, 2017, E.W. and C.W. were finally placed back into Janet's care and custody.

140.    On July 25, 2017, the order terminating DCS oversight of the family was approved.

## H.    Ongoing Problems/Issues from Being Removed from the Home

141.    The whole family has been through unthinkable amount of stress and emotional harm as a result of the defendants' conduct and actions. Janet and her minor children live in fear that DCS and the foster system will somehow be involved with their lives again. C.W. still has anxiety attacks as a result of the experience.

142.    The defendant have violated the plaintiffs' right to be free from unreasonable searches and seizures under the 4th Amendment. The defendants had no objectively reasonable basis to seize E.W. and C.W. and remove them from the home after the January 12 hearing. The continued detention of the children constituted a continuing violation of this Fourth Amendment right.

143.    Defendant Bolka violated Janet's right to petition the government for redress of grievances, as protected by the First Amendment, by retaliating her with knowing false statements after she complained about his misconduct.

144.    Throughout these proceedings, the defendants have trampled on the plaintiffs' rights to procedural and substantive due process under the 14th Amendment, including but not limited to the fundamental right of a parent to direct

21

the education and upbringing of her children and the presumption of fitness that the state actors failed to overcome and in fact fabricated evidence in an attempt to rebut that presumption. *See Troxel v. Granville*, 530 U.S. 57 (2000).

145.    Certain defendants, as described above, have further deprived the plaintiffs of their rights to procedural and substantive due process under the 14th Amendment by engaging in ex arte contact with the court in these proceedings.

146.    The defendants all acted under color of state law and with deliberate indifference to the rights of the plaintiffs, such that a reasonable government official in the defendant's position would have understood that his or her actions violated plaintiff's clearly established rights.

147.    Moreover, the defendants, including Zarowny's own physical and emotional abuse, inflicted physical and emotional harm on the plaintiffs as a result of various intentional, grossly negligent, and negligent conduct that caused such harm. Such intentional conduct includes assault and battery.

## RELIEF REQUESTED

148.    Each of the above counts constitutes a separate violation of 42 U.S.C. § 1983 and other law. For each of these violations, Janet Wehmeyer, E.W., and C.W. Wehmeyer seek to recover the following:

   a.    compensatory damages in an amount to be determined by a jury;

   b.    punitive damages in an amount to be determlined by a jury;

   c.    reasonable attorney and expert fees pursuant to 42 U.S.C. § 1988;

   d.    any further relief that may be appropriate.

Respectfully submitted,

Janet Wehmeyer, on behalf of herself and her
minor children

708 Camelot Manor
Portage, IN 46368
219-448-9898
Janet.wehmeyer@yahoo.com

23